UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JAMES V. MUDD,

                    Plaintiff,

vs.                                Case No.  2:05-cv-137-FtM-29DNF

UNITED STATES ARMY,

                    Defendant.

_____

**OPINION AND ORDER**

_____This matter comes before the Court on the United States Army's Motion for Summary Judgment (Doc. #55) and Amended Motion for Summary Judgment (Doc. #57).  Plaintiff James V. Mudd filed a Memorandum in Opposition (Doc. #60) on August 30, 2007.  On September 25, 2007, the United States Army filed a Notice of Supplemental Authority (Doc. #67).

On October 15, 2007, the Court conducted a Final Pretrial Conference and provided counsel the opportunity to submit additional authority in support of or in opposition to summary judgment.  On October 19, 2007, plaintiff filed a Supplemental Memorandum in Opposition to Defendant's Amended Motion for Summary Judgment (Doc. #71) and defendant filed a Supplement to Amended Motion for Summary Judgment (Doc. #72).  Based on the amended motion (Doc. #57), the original motion (Doc. #55) will be terminated as moot.

**I.**

The relevant and undisputed material background facts are as follows:

James V. Mudd ("Mudd") is a retired United States Army Colonel. Mudd's last official duties included oversight of the Upper Mississippi River-Illinois Waterway Navigation Feasibility Study ("the Study").  The Upper Mississippi River extends from Minneapolis, Minnesota, to the junction of the Ohio River just north at Cairo, Illinois; it is 845 miles long with 29 locks and dams.  The Illinois Waterway serves as the connecting link between the Great Lakes, the Saint Lawrence Seaway, and the Mississippi River, and has 8 locks and dams.  The combined system of locks and dams on the Upper Mississippi and the Illinois Waterway is referred to as the Upper Mississippi River-Illinois Waterway navigation system ("the Waterway").

During the 1980's the U.S. Army Corps of Engineers (the "Corps") was given Congressional authorization to undertake a formal study of the Waterway.  This study indicated that major capital improvements were needed on at least five locks in the navigation system.  In 1993, another study was initiated to "describe and evaluate alternative project plans, assess environmental impacts and determine if a solution could be economically beneficial."  Dr. Donald Sweeney was the lead economist who devised a new economic modeling technique for the Study.

In July 1997, Mudd assumed command of the Rock Island District, Mississippi Valley Division of the U.S. Army Corps of Engineers, which was the lead district for the Study. Upon review of the Study, Mudd became concerned that Dr. Sweeney and his team consistently missed deadlines and about the assumptions related to the "N" value in the economic model. Mudd had Dr. Sweeney reassigned off the Study.

In February 2000, Dr. Sweeney filed an affidavit with the U.S. Office of Special Counsel (OSC)[1] accusing Corps officials of altering Study data in order to support additional capital improvements to the navigation system. The OSC found a substantial likelihood that the Corps violated regulations and wasted millions of dollars of taxpayer funds, forwarded the allegations to the Department of Defense, and informed the Department of Defense that it was required to investigate the allegations and submit a written report of its findings.

In the Spring of 2000, the Department of Defense, acting through the Department of the Army Inspector General ("DAIG"), began its investigation. Plaintiff retired on September 1, 2000.

On September 28, 2000, the Secretary of the Army approved the DAIG Report of Investigation ("DAIG Report") and forwarded it to the Secretary of Defense. The DAIG Report indicated that Mudd (and

---

[1]The Office of Special Counsel is an independent federal investigative and prosecutorial agency.

two other officers) took or directed actions which he knew, or reasonably should have known, would contribute to the production of a feasibility study failing to meet standards established in law and regulation.  On November 13, 2000, the Secretary of Defense forwarded the DAIG Report to the OSC.  On November 20, 2000, the OSC gave a copy of the DAIG Report to Dr. Sweeney.

On December 6, 2000, Elaine Kaplan, Special Counsel for the OSC, issued a press release and conducted a press conference regarding the results of the Department of Defense investigation. Ms. Kaplan released copies of the complete DAIG Report to the press; she also posted a complete copy on the OSC's Internet website.  (Doc. #34-28, ¶ 39.)

Mudd received a Memorandum of Admonishment dated December 12, 2000, from General John M. Keane, the Vice Chief of Staff for the Army.  Mudd was admonished for improperly taking or directing actions which he knew, or reasonably should have known, would contribute to the production of a feasibility study that would fail to meet standards established in law and regulation.  (Doc. #34-20.)  Mudd was not officially reprimanded and the Memorandum of Admonishment was not placed in his personnel record.  (Doc. #34-20, ¶¶ 3-4.)

In mid-to-late December 2000, Mudd was contacted by a reporter for the *Quad City Times* newspaper of Davenport, Iowa, regarding the DAIG Report released by the OSC, and gave an interview.  Mudd maintains that during the interview he did not disclose the

admonishment.  (Doc. #60-7, ¶¶5-7.)  On December 24, 2000, the *Quad City Times* published an extensive article ("Col. Mudd goes on record") discussing the DAIG Report and Mudd's reaction to it.  The article also stated that Mudd had received a letter of admonishment the previous Thursday which "essentially criticized his actions as reflecting poorly on the Army, he [Mudd] said."  (Doc. #57-3, pp. 2-5.)

In a January 16, 2001 letter from the OSC, Mudd was told that a copy of the DAIG Report could be downloaded from the OSC's website.  In a letter dated January 28, 2001, Mudd informed the Army that he had downloaded the DAIG Report from the OSC's website.

By January 2001, Mudd was employed by Collier County, Florida as the Public Utilities Administrator.  An inquiry was made by a *Naples Daily News* reporter concerning the DAIG Report.  On January 25, 2001, Collier County Manager Tom Olliff (Olliff) asked Mudd in an e-mail whether Mudd was willing to release the "closure letter" that was sent to Mudd's file.  In a response e-mail the dame day, Mudd consented to the release of the Memorandum of Admonishment to the *Naples Daily News* with certain conditions.  Mudd also proposed a response to the reporter's inquiry concerning the DAIG Report and the Memorandum of Admonishment, including that "First - The Investigation found no criminal act.  Any disciplinary action to be taken was directed to the Army for action.  It has taken place, COL (Ret)/Mr.. Mudd has received that action in the form of a Letter of

Admonishment from the Vice Chief of Staff of the U.S. Army and the matter is officially closed." (Doc. #57-3, pp. 6-7.) Mudd stated in an Affidavit in opposition to summary judgment that upon reflection he and Olliff agreed not to release the admonishment to the *Naples Daily News* (Doc. #60-7, Exh. F, ¶ 8.) The Department of Public Information of Collier County issued a press release on January 25, 2001, on behalf of Olliff to state, among other things: "First, the investigation involving Mudd found no criminal act was committed and any disciplinary action to be taken was directed to the Army. That action by the Army was a letter of admonishment received by Mudd from the Army Vice Chief of Staff Gen. John M. Keane. The matter is now officially closed." (Doc. #57-3, p. 8.) The press release was fully consistent with the response suggested by Mudd, and concluded with statements of support by Olliff, who stated he had been aware of the investigation before Mudd was hired and that the end result was a letter of admonishment and not even an official reprimand. (Id. at p. 9.)

On January 26, 2001, the *Naples Daily News* published an article regarding the Corps's "scandal." The article reported a Naples City Councilman's lack of trust in plaintiff and the County's press release, and discussed the DAIG Report and Mudd's letter of admonishment. (Id. at pp. 10-13.)

On March 15, 2001, plaintiff testified before the United States House of Representatives at an Upper Mississippi River

Caucus Spring Hearing regarding the Waterway Study.  Plaintiff discussed both the DAIG Report and the Memorandum of Admonishment, (Doc. #57-3, pp. 14-34; Doc. #60-7, ¶¶9-10) and read a portion of the Memorandum of Admonishment into the record.  (Doc. #57-3, pp. 18-19.)  On March 16, 2001, an e-mail communication was sent from Army headquarters to Mudd stating that a hot topics page on the Army's website would include his testimony.   (Doc. #72-2.)

In or about April 2001, the Army provided a hyperlink on its website to the OSC's website, Doc. #57-2, p. 35, where a copy of the DAIG Report could be obtained, Doc. #57-4.  The Army added an external links notice in May 2002 to state that the "appearance of hyperlinks does not constitute an endorsement by the US Army Corps of Engineers of the Web site or the information, products or services contained therein.  The US Army Corps of Engineers does not exercise any editorial control over the information you may find at these locations.  Links are provided consistent with the purpose of this DoD Web site."  (Docs. #37-2, ¶ 5; #57-4, ¶ 5.) The OSC removed the DAIG Report from its website on or about April 2003.  (Doc. #34-2 at p. 3.)

Also in or about April 2001, the Army posted information about the Study and the DAIG Report on its website in a question and answer format.  These Frequently Asked Questions (FAQ) included the following:

> Question - On September 28, 2000, the Secretary of the Army approved a Department of the Army Inspector (DAIG) Investigation which substantiated allegations that . . .

> and Colonel James V. Mudd, former Commander, Rock Island
> District, Mississippi Valley Division, U.S. Army Corps of
> Engineers, improperly took or directed actions which they
> knew or reasonably should have known would contribute to
> the production of a feasibility study which did not meet
> the standards established in law or regulation.  What
> happened to these officers named in that DAIG report?
>
> Answer - The Secretary of the Army forwarded the
> investigation to the Vice Chief of Staff, Army, for
> appropriate action.  On December 12, 2000, the Vice Chief
> of Staff admonished . . . and Colonel Mudd for their
> conduct.  No further action against these individuals is
> contemplated.

(Doc. #34-27, Doc. #57-2, pp. 31-32.)

The original Complaint (Doc. #1) was filed on April 1, 2005. On December 20, 2006, plaintiff filed a two-count Second Amended Complaint, which is the operative pleading.  In Count I, plaintiff alleges violation of the Privacy Act, 5 U.S.C. § 552a, for which he seeks money damages.  The alleged Privacy Act violations are the publication of the complete DAIG Report on the Corps' website and the publication of information related to plaintiff's admonishment on the Corps' website.  In Count II, plaintiff alleges violation of the Administrative Procedures Act, 5 U.S.C. § 702, *et seq.* (APA). The alleged APA violation was that the Army failed to follow its own regulations in connection with the admonishment, for which plaintiff sought non-monetary declaratory and injunctive relief.

On July 10, 2007, the Court entered an Opinion and Order (Doc. #45) denying defendant's Motion to Dismiss Second Amended Complaint as to Count I and granting the motion as to Count II for failure to

exhaust administrative remedies.   The Army now seeks summary judgment as to Count I.

## II.

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue at to any material fact and that the moving party is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(c).   An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if it may affect the outcome of the suit under governing law.  Id.  The moving party bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004).

To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, which are sufficient to establish the existence of the essential elements to that party's case, and the elements on which that party will bear the burden of proof at trial motion.  Celotex Corp. v. Catrett, 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th

Cir. 1999).  In ruling on a motion for summary judgment, if there is a conflict in the evidence the non-moving party's evidence is to be believed and all reasonable inferences must be drawn in favor of the non-moving party.  <u>Shotz v. City of Plantation, Fl.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003).

### III.

The Army argues summary judgment is appropriate in this case for two reasons.  First, the Army asserts that plaintiff's Privacy Act claim in Count I is barred by the statute of limitations.  Second, the Army asserts that it did not improperly disclose information protected by the Privacy Act.  The Court addresses these arguments in reverse order.

### A.

"The [Privacy] Act gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements."  <u>Doe v. Chao</u>, 540 U.S. 614, 618 (2004).  One of the requirements of the Privacy Act is that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains. . . ."  5 U.S.C. § 552a(b).[2]  Disclosures in violation of

---

[2]Certain exceptions to this non-disclosure apply, including
(continued...)

the Privacy Act may be remedied by a civil action brought under a catchall provision of the Privacy Act:

> Whenever any agency . . .
>
> (D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provision of this subsection.

5 U.S.C. § 552a(g)(1)(D).  If the court determines that the agency acted in a manner which was intentional or willful, the United States is liable for an amount equal to actual damages (but not less than $1,000) and costs and reasonable attorney fees.  5 U.S.C. § 552a(g)(4).  A plaintiff must have suffered some actual damages in order to qualify for the statutory $1,000 minimum, and merely showing an intentional or willful violation of the Privacy Act producing an adverse effect is not sufficient.  Chao, 540 U.S. at 627.  "Actual damages" means proven pecuniary (out of pocket) losses, not damages for generalized mental injuries, loss of reputation, embarrassment, or other non-quantifiable injuries. Fitzpatrick v. Internal Revenue Service, 665 F.2d 327, 331 (11th Cir. 1982), abrogated on other grounds, Doe v. Chao, 540 U.S. at 627 n.12.

---

[2](...continued)
required disclosures under the Freedom of Information Act (FOIA). 5 U.S.C. § 552a(b)(2); Cochran v. United States, 770 F.2d 949, 954-955 (11th Cir. 1985).

**(1)**

Plaintiff asserts that the Army violated the Privacy Act by disclosing the existence of the admonishment on its website in April 2001. Not every release of information constitutes a "disclosure" within the meaning of the Privacy Act, and the Court concludes that there was no such disclosure of the admonishment in this case.

As stated above, the information released consisted of a statement in a question-and-answer format that on December 12, 2000, the Vice Chief of Staff admonished Colonel Mudd (and two others) for their conduct, and that no further action was contemplated. (Doc. #34-27, Doc. #57-2, pp. 31-32.) By the time this statement had been posted on the Corps' website, plaintiff had done the following: (1) Given a December 2000 interview to a reporter for the *Quad City Times* which resulted in a newspaper article quoting him as saying he had received a letter of admonishment which criticized his actions as reflecting poorly on the Army; (2) drafted a proposed response to a January 2001 inquiry from a reporter for the *Naples Daily News* in which plaintiff suggested that the County make reference to the Letter of Admonishment from the Vice Chief of Staff of the U.S. Army, which resulted in a press release from Collier County referring to the letter of admonishment from the Army Vice Chief of Staff Gen. John M. Keane and a subsequent newspaper article referring to the letter

of admonishment; and (3) testified before a United States House of Representatives hearing on March 15, 2001, in public session in which he discussed the letter of admonishment and quoted at length from it.  Thus, by the time the Army had posted its statement about the admonishment of its website, plaintiff had publicly and repeatedly disclosed not only its existence but its contents. Under these circumstances the Court finds that there was no "disclosure" within the meaning of the Privacy Act.  <u>Barry v. U.S. Dept. Of Justice</u>, 63 F. Supp. 2d 25 (D.D.C. 1999)(posting information on website after it had already been released to the public and discussed in Congressional hearing was not a "disclosure" under Privacy Act); <u>Federal Deposit Ins. Corp. v. Dye</u>, 642 F.2d 833, 836 (5th Cir. 1981)[3](release of information which had already been published in newspaper of adjoining county was not "disclosure" under Privacy Act).  <u>See also</u> <u>Pellerin v. Veterans Admin. of U.S. Gov't</u>, 790 F.2d 1553, 1556 (11th Cir. 1986).  A privacy interest fades when the information involved is already public.  <u>Cox Broad. Corp. v. Cohn</u>, 420 U.S. 469, 494-495 (1975)(no cause of action for invasion of privacy for publishing information already available to the public).

---

[3]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

**(2)**

As to the DAIG Report, the Army released that report by providing a link to the OSC website, which contained the report. The Court assumes, without deciding, that establishing such a link to another's website could be a disclosure within the meaning of the Privacy Act.  However, in April 2001, at the time the Army's link was provided, the entire DAIG Report had been the subject of a press release and news conference by a separate and independent agency (the OSC) and had been released to the media by the same. The media had reported on the events surrounding the DAIG Report, plaintiff had been interviewed by the press, and had testified before a congressional committee about the DAIG Report.  The Court finds that the establishment of the link under these circumstances was not a "disclosure" within the meaning of the Privacy Act.

**(3)**

The Army also argues that the release of the DAIG Report via the link to the OSC website was protected under the FOIA exception to the Privacy Act, 5 U.S.C. § 552a(b)(2).  Although there was no formal FOIA request, the Army asserts that the media interest was essentially a FOIA request, and therefore justified establishment of the link.  See News-Press v. U.S. Dep't of Homeland Sec., 489 F.3d 1173, 1189 (11th Cir. 2007)("The net effect of the interaction between the two statutes is that where the FOIA requires disclosure, the Privacy Act will not stand in its way, but where

the FOIA would permit withholding under an exemption, the Privacy Act makes such withholding mandatory upon the agency.")

There is no factual dispute about the intense media interest in the matter; plaintiff's own affidavit reflects the repeated media interest in both Iowa and Florida, and the pressure he felt to give the interviews and testify before the Senate hearing.  The Court agrees that under the circumstances of this case, the balance of plaintiff's privacy against the public's right to disclosure weighs in favor of public disclosure, and that the FOIA exception was applicable even without a formal FOIA request.  Cochran v. United States, 770 F.2d 949 (11th Cir. 1985).  Thus, the information was available to all members of the public.  News-Press, 489 F.3d at 1187.

**B.**

Even if the Privacy Act was violated, the Army asserts that plaintiff's Privacy Act claim is barred by the applicable statute of limitations.  A lawsuit seeking civil damages under the Privacy Act must be filed

> . . . within 2 years from the date on which the cause of action arises, except that where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within 2 years after discovery by the individual of the misrepresentation.

5 U.S.C. § 552a(g)(5).  A Privacy Act cause of action arises or accrues when the information is disclosed.  Oja v. U.S. Army Corps

of Eng'rs, 440 F.3d 1122, 1128 (9th Cir. 2006).  Here, the information was made public by the Army in April 2001, and the Complaint was filed on April 1, 2005.  Thus, the Complaint was not filed within two years of the date on which the cause of action arose.

Plaintiff asserts that the exception to this two year limitation is applicable in this case.  The exception provides that "where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within 2 years after discovery by the individual of the misrepresentation." 5 U.S.C. § 552a(g)(5).  Plaintiff asserts that he comes within this exception because

> [r]ecent discovery in this case has shown clear evidence
> that Army intentionally and willfully withheld
> information and engaged in a pattern of misinformation
> regarding the findings in the DAIG ROI and follow-up
> studies.  Various individuals and entities have
> investigated the Navigation Study and issued reports
> which have called the findings of the DAIG ROI into
> question.  Yet, Army has intentionally withheld
> exculpatory information in an attempt to move beyond the
> negative implications of the report for the Corps.

(Doc. #60, pp. 5-6.)  Plaintiff has failed to demonstrate that such information allegedly undermining the accuracy of the DAIG Report was materially and willfully misrepresented by the Corps, or that it was information required under the Privacy Act to be disclosed

to plaintiff, or that the allegedly misrepresented information was material to establishment of the liability of the Corps to plaintiff under the Privacy Act.  Therefore, the Court concludes that Count I would be barred by the statute of limitations.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1.  The United States Army's Motion for Summary Judgment (Doc. #55) is **terminated as moot.**

2.  The United States Army's Amended Motion for Summary Judgment (Doc. #57) is **GRANTED** as to Count I.

3.  The Clerk shall enter judgment in favor of defendant as to Count I and dismissing Count II without prejudice for failure to exhaust administrative remedies pursuant to the July 10, 2007 Opinion and Order (Doc. #45).  The Clerk is further directed to cancel all remaining deadlines as moot and to close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this __10th__ day of December, 2007.

_____
JOHN E. STEELE
United States District Judge

Copies:
Counsel of record